In the Matter of PARK NORTH PART-NERS, LTD., a Florida Limited Partnership, f/k/a Florida Realty Partners, XXV, Debtor.

PARK NORTH PARTNERS,
LTD., Plaintiff,

v.

PARK NORTH ASSOCIATES, Michel
Brasseur and Duffle Corp.,
Defendants.

Bankruptcy No. A85–03974–ADK.
Adv. No. 85–0828A.

United States Bankruptcy Court,
N.D. Georgia,
Atlanta Division.

March 26, 1987.

Lewis E. Hassett, Aiken & Ward, Atlanta, Ga., for plaintiff.

Luther J. Carroll, III, Abney, Tate & Mallernee, Atlanta, Ga., for defendants.

## MEMORANDUM OF OPINION AND ORDER

A.D. KAHN, Bankruptcy Judge.

Plaintiff-Debtor filed the above-styled adversary complaint seeking certain relief against the Defendants. A trial was held on February 4, 1987, after which the Court took the matter under advisement. The Court finds this matter to constitute a core proceeding within the meaning of 28 U.S.C. § 157(b). After considering the testimony and evidence at trial along with the post-trial briefs of the Parties, the Court makes the following findings of fact and conclusions of law.

## I. FINDINGS OF FACT

1. Defendant Park North Associates is a Georgia limited partnership. Defendants Michel Brasseur and Duffle Corp. were general partners of Park North Associates at the time of the foreclosure at issue.

2. On or about December 20, 1980, Plaintiff-Debtor purchased from Defendant Park North Associates certain real property located in Fulton County, Georgia, known as the Park North Office Building [hereinafter referred to as "the Property"].

3. The purchase price was $1,200,-000.00, payable as follows:

| | | |
|---|---|---|
| a) | Down Payment | $ 120,000.00 |
| b) | Short Term Note | $ 240,000.00 |
| c) | Wrap Around Note | $ 840,000.00 |
| | TOTAL | $1,200,000.00 |

4. Plaintiff-Debtor subsequently paid the Short Term Note of $240,000.00.

5. The Wrap Around Note of $840,-000.00 was captioned "All Inclusive Purchase Money Promissory Note" and was secured by an "All Inclusive Purchase Money Deed to Secure Debt and Security Agreement" [hereinafter collectively referred to as "the Wrap Note"].

6. The Wrap Note included the balances of other promissory notes secured by superior liens on the Property [hereinafter collectively referred to as "the Underlying Debt"].

7. In April 1985, the Defendant declared a default in the Wrap Note and proceeded to advertise the Property for a foreclosure sale.

8. The foreclosure advertisement appeared in the Fulton County Daily Report on April 12, 19, and 26, and on May 3, 1985.

9. The advertisement described the Wrap Note and then stated that the Wrap Note would be foreclosed "subject to" the Underlying Debt.

10. The foreclosure sale was held on May 7, 1985. At the foreclosure sale, the Defendant's attorney, James Beach read the advertisement, including the specification that the Property was being sold subject to the Underlying Debt. Beach then opened the bidding, and Karl Wiley announced a bid of $857,209.83 on behalf of the Defendant. This was the highest bid received.

11. The Parties have stipulated that the fair market value of the Property on the date of foreclosure was $1,050,000.00. The Parties have further stipulated that the Debtor was insolvent on the date of foreclosure.

12. A Deed Under Power was subsequently recorded. The Deed Under Power stated that the consideration was $857,-209.83, cash, and that the sale was made "subject to" the Underlying Debt.

13. On the date of the foreclosure sale, the total outstanding balance of the Wrap Note was $857,209.83. On the date of the

foreclosure sale, the outstanding balance of the Underlying Debt was as follows:

    (a) Promissory Note made by F.P. Plaza to Great American Mortgage Investors, assigned to Volunteer State Life Insurance Company of Concord, New Hampshire, balance of $275,713.34;

    (b) Promissory Note made by Asa G. Candler and Robert S. Griffith to Avice Tinsley, balance of $6,286.92;

    (c) Promissory Note from the Defendant to Park North Offices, Ltd., balance of $56,069.72.

14. On August 2, 1985, the Debtor filed its Voluntary Chapter 11 Petition in the United States Bankruptcy Court for the Northern District of Georgia, Bankruptcy Case No. A85–03974–ADK.

## II. CONCLUSIONS OF LAW

Plaintiff-Debtor's Complaint contains five separate counts alleging the following:

*Count I.* The Property is property of the estate within the meaning of 11 U.S.C. § 541, and Defendant is violating the automatic stay by exercising control over it;

*Count II.* The foreclosure sale constituted a fraudulent transfer pursuant to 11 U.S.C. § 548 in that Defendant's bid at foreclosure was less than reasonably equivalent value;

*Count III.* The foreclosure sale constituted a voidable preference within the meaning of 11 U.S.C. § 547;

*Count IV.* Defendant chilled the bidding at the foreclosure sale by not disclosing the balance of the notes included in the Underlying Debt;

*Count V.* Defendant has failed to account to Plaintiff-Debtor for surplus proceeds arising out of the foreclosure sale.

Each Count will be discussed separately below.

### A. Count I.

In Count I, Plaintiff-Debtor seeks a declaratory judgment pursuant to 28 U.S.C. § 2201 *et seq.* and 11 U.S.C. § 105(a) that the Property constitutes property of the estate pursuant to § 541 of the Bankruptcy Code. Although not specifically stated in its Complaint, Plaintiff-Debtor's theory appears to be that the foreclosure sale was not complete prior to the filing of the Plaintiff-Debtor's bankruptcy petition because Defendant failed to deliver and distribute the consideration for the sale. *See* Plaintiff-Debtor's Trial Brief at 19–20. The Court must reject this theory. The foreclosure was complete upon sale to the highest bidder. *Heard v. Decatur Fed. Sav. & Loan Ass'n*, 157 Ga.App. 130, 134, 276 S.E.2d 253 (1980). *See also, Lincoln Fin. Corp. v. Gray (In re Gray)*, 37 B.R. 532 (Bankr.N.D.Ga.1984). Therefore, the Property was not property of the estate on the date Plaintiff-Debtor filed its bankruptcy petition.

### B. Count II.

In Count II, Plaintiff-Debtor maintains that the foreclosure constituted a fraudulent conveyance pursuant to 11 U.S.C. § 548(a)(2) because Plaintiff-Debtor received less than a reasonably equivalent value in exchange for the transfer. This cause of action is based upon the Fifth Circuit Court of Appeals decision of *Durrett v. Washington Nat'l. Ins. Co.*, 621 F.2d 201 (5th Cir.1980), in which the Court found § 67(d) of the Bankruptcy Act regarding fraudulent transfers to be applicable to foreclosure sales. In order to succeed under § 548, the Bankruptcy Code's comparable fraudulent transfer section, Plaintiff-Debtor must establish the following:

1. that property of the Debtor was transferred on or within one year before the date of the filing of the bankruptcy petition;

2. that the Debtor received less than a reasonably equivalent value for the transfer; and

3. that the Debtor was insolvent on the date that such transfer was made, or became insolvent as a result of such transfer.

*See* Section 548(a)(2). As stated in Part I of this Memorandum of Opinion, Plaintiff-Debtor has established the first and third elements of a fraudulent transfer. The issue before the Court is whether Plaintiff-

Debtor received less than a reasonably equivalent value for the transfer.

In *Durrett*, the Fifth Circuit discussed what constitutes a "fair equivalent" value for property transferred in the context of a fraudulent conveyance action. The Court stated that "We have been unable to locate a decision of any district or appellate court dealing only with a transfer of real property as the subject of attack under section 67(d) of the Act, which has approved the transfer for less than 70 percent of the market value of the property." *Durrett*, 621 F.2d at 203. "It is generally accepted in the Fifth and Eleventh Circuits that the *Durrett v. Washington Nat'l Ins. Co.* case sets an upset price equal to 70% of the market value of the property at the time of the foreclosure." *Federal Nat'l. Mortgage Ass'n. v. Wheeler (In re Wheeler)*, 34 B.R. 818, 821 (Bankr.N.D.Ala.1983) citing *Coleman v. Home Sav. Ass'n. (In re Coleman)*, 21 B.R. 832 (Bankr.S.D.Tex.1982); *Perdido Bay Country Club Estates, Inc. v. Equitable Trust Co. (In re Perdido Bay Country Club)*, 23 B.R. 36 (Bankr.S.D.Fla. 1982); *Smith v. Am. Consumer Fin. Corp. (In re Smith)*, 21 B.R. 345 (Bankr.M.D.Fla. 1982); *Wickham v. United Am. Bank (In re Thompson)*, 18 B.R. 67 (Bankr.E.D. Tenn.1982).

In the proceeding *sub judice*, the Parties disagree on the method of calculating the percentage to be used to compare the sales price to the fair market value of the property at the time of the foreclosure. Defendants maintain that the sales price was 81.6% of the fair market value at the time of foreclosure. This is calculated by comparing the fair market value ($1,050,000.00) to the total sales price ($857,209.83). Plaintiff-Debtor, on the other hand, maintains that the correct percentage is 72.9% which is calculated by comparing the net value purchased (value of property less remaining debt) to the amount of the lien foreclosed upon. It is unnecessary for the Court to decide which method of calculation is correct. Both methods yield percentages greater than the 70% minimum established by *Durrett*.

Plaintiff-Debtor urges this Court to not interpret *Durrett* as holding that any percentage above 70% will constitute a reasonably equivalent value for the purposes of § 548. Plaintiff-Debtor also urges the Court to consider other factors which it maintains compels a conclusion that the procedures followed by the Defendants in foreclosing on the Property were "both unfair and violated state restrictions as to bid chilling." Plaintiff-Debtor's Trial Brief at 25. The Court finds that, although it is bound to follow the *Durrett* decision by the case of *Bonner v. City of Prichard*, 661 F.2d 1206 (11th Cir.1981), a validly conducted foreclosure should not be easily set aside. The Court will strictly follow the 70% "rule" established by *Durrett* where the bid is greater than that minimum. Therefore, even when using Plaintiff-Debtor's figures, the Court finds that there was a reasonably equivalent value given for the Property. Plaintiff-Debtor's other contentions regarding the chilling of bids by the Defendants will be discussed below in Subsection D.

C. Count III.

Count III of Plaintiff-Debtor's complaint seeks to set aside the transfer as a preference pursuant to § 547. The following five elements must be established to prove a preference. The transfer must have been:

(1) to or for the benefit of a creditor;

(2) for or on account of an antecedent debt owed by the debtor before such transfer was made;

(3) made while the debtor was insolvent;

(4) made—

(A) on or within 90 days before the date of the filing of the petition; or

(B) between ninety days and one year before the date of the filing of the petition, if such creditor at the time of such transfer was an insider; and

(5) that enables such creditor to receive more than such creditor would receive if—

(A) the case were a case under chapter 7 of this title;

(B) the transfer had not been made; and

(C) such creditor received payment of such debt to the extent provided by the provisions of this title.

All five elements must be established before a transfer will be determined to be a preference. Here, Plaintiff-Debtor has failed to prove the fifth element—that Defendants received more than they would have under a Chapter 7 distribution. As a secured creditor, Defendant Park North Associates received no more than it would have received in a Chapter 7 case. Therefore, Plaintiff-Debtor has failed to establish that the transfer was a preference pursuant to § 547. *See Erman v. Armco, Inc.* (*In re Formed Tubes, Inc.*), 41 B.R. 819 (Bankr.E.D.Mich.1984); *Eisenberg v. E. Carolina Ship Agencies* (*In re Timber Line, Ltd.*), 59 B.R. 728 (Bankr.S.D.N.Y. 1986).

### D. Count IV.

█ In Count IV, Plaintiff-Debtor alleges that Defendants chilled the bidding at the foreclosure sale by 1) failing to disclose that the balance of the notes included the Underlying Debt and 2) the manner in which the sale was conducted. Plaintiff-Debtor's Trial Brief at 16–17. The newspaper ad stated, in part, that

Said Deed to Secure Debt secures the indebtedness described in the Deed to Secure Debt including, without limitation, that certain *All-Inclusive Promissory Note* dated December 20, 1980 in the original face amount of EIGHT HUNDRED FORTY THOUSAND AND NO/100 ($840,000.00) DOLLARS, executed by Grantor in favor of Grantee (hereinafter referred to as the 'Note').

Joint Trial Exhibit 12 (emphasis added). Attorney Mark Elliott, Plaintiff-Debtor's expert witness, testified that it would be reasonable to infer that "All-Inclusive Promissory Note" referred to a wrap around note. The advertisement expressly disclosed that the note being foreclosured was subject to the three underlying security deeds securing the Underlying Debt. The Court finds that, by advertising that the debt being foreclosed was evidenced by an "All-Inclusive Promissory Note" and that the foreclosure sale was subject to three prior security deeds, any prospective purchasers were put on reasonable inquiry to ascertain the nature of the "All-Inclusive Promissory Note" and the amount of the Underlying Debt.

Plaintiff-Debtor further argues that, by bidding in the total amount of the Wrap Note, Defendants chilled the bidding because any prospective purchaser would have been willing to bid in no more than $711,930.02 (the fair market value of the Property ($1,050,000.00) less the Underlying Debt ($338,069.98)). Plaintiff-Debtor's Trial Brief at 18. The argument that a higher bid by a purchaser at foreclosure chills the bidding goes against logic. The bid of a foreclosing party at any foreclosure sale is treated just like the bid of any other party. Plaintiff-Debtor asks this Court to hold that a wrap note holder cannot bid any more than the equity of his wrap note at foreclosure. Such a limitation would indeed chill the bidding. It would defy logic to hold that a bid of $857,209.83 for a property that Plaintiff contends a third party would have been willing to bid only $711,930.32 chilled the bidding. Had the $857,209.83 bid been made by a third party, no argument could be raised concerning a chilled bid, and, as stated previously, this Court refuses to treat the bid of a foreclosing party differently than the bid of any other entity. The only issue that remains is the manner in which the sale proceeds from this bid are to be treated. This issue is addressed in Count V.

### E. Count V.

█ In Count V, Plaintiff-Debtor contends that Defendants have failed to account to Plaintiff-Debtor for surplus proceeds arising out of the foreclosure sale. This Court has previously considered this argument in connection with Plaintiff-Debtor's Motion for Partial Summary Judgment. In a Memorandum of Opinion and Order entered September 10, 1986, the Court rejected Plaintiff-Debtor's contention that any surplus resulted from the foreclosure in question. While no final decision

was entered at that time because there was no cross-motion for summary judgment filed by Defendants, the Court finds nothing new has been added to Plaintiff-Debtor's arguments. Thus, once again the Court must reject Plaintiff-Debtor's contentions that any surplus existed. The Court bases this conclusion upon the same reasoning set out in the September 10, 1986 Memorandum of Opinion and Order, which for ease of reference is repeated below.

Plaintiff-Debtor seeks to recover the alleged surplus of funds resulting from the foreclosure sale by Defendant. It argues that, because the sale was "subject to" the underlying debt, it is entitled to the "surplus" of $338,069.98, which equals the amount of the Underlying Debt. Defendants deny that there was any surplus from the foreclosure sale: Plaintiff-Debtor owed Defendants $857,209.83, the total amount of the wrap note, and that is exactly what was bid at the sale. Neither Party has cited to the Court, nor has the Court located any cases dealing with this surplus issue in the context of a wrap around mortgage.

The wrap around note is a financing technique which is utilized by purchasers and sellers to take advantage of existing favorable financing on property. A borrower benefits from a wrap around mortgage by obtaining an overall lower interest rate on the total debt due on the property. However, the borrower thereby becomes liable on the entire wrap debt to the holder of the wrap note. Upon receipt of payments under a wrap note, the wrap note holder becomes obligated to the debtor to pay the underlying debt as it becomes due.

In the case *sub judice*, Plaintiff-Debtor was obligated to Defendant in the amount of $857,209.83 on the date of foreclosure, and this is the amount bid in by Defendant. There was no surplus. The property was foreclosed subject to the underlying security deeds, and these continued to encumber the property. Defendant bought the property subject to these debts and, if not timely paid, would be subject to foreclosure. No inconsistency is created by Defendant foreclosing "subject to" the underlying debt. Defendant, as the holder of the wrap note, became obligated upon foreclosure to pay the difference between the amount bid and its wrap equity ($857,209.83 − $519,-139.85 = $338,069.98) over to the holders of the underlying debts as they became due. Therefore, there was no surplus, and Plaintiff-Debtor is entitled to no recovery against Defendants.

ORDER

In accordance with the reasoning above, it is the Order of the Court that all relief sought in Plaintiff-Debtor's Complaint be, and the same hereby is, DENIED.

An appropriate Judgment is entered contemporaneously herewith.